**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **BARBARA GLASS, INDIVIDUALLY,** | * | **CIVIL ACTION NO.  2:16-cv-13762** |
| **AND AS ADMINISTRATRIX OF THE** | * | |
| **SUCCESSION OF ROBERT GLASS, AND** | * | **SECTION "___" (___)** |
| **AS NATURAL TUTRIX OF KARLI** | * | |
| **GLASS, KAMERON GLASS AND** | * | **JUDGE:** |
| **KYLEIGH GLASS, AND MISTY CRUZ** | * | |
| **ON BEHALF OF JULIAN CRUZ** | * | **MAGISTRATE:** |
| | * | |
| **VERSUS** | * | **JURY TRIAL REQUESTED** |
| | * | |
| **FIELDWOOD ENERGY, LLC,** | * | |
| **ISLAND OPERATING COMPANY, INC.,** | * | |
| **SHAMROCK MANAGEMENT, LLC,** | * | |
| **PATRICK HUSE, JOHN RILEY,** | * | |
| **RICHARD TATE, GREGG FALGOUT,** | * | |
| **JOHN SALDANA, CRAIG ROBICHAUX,** | * | |
| **AND JASON LYONS.** | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPLAINT FOR DAMAGES**

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Barbara Glass, as Administratrix of the Succession of Robert Glass, and as natural tutrix of Karli Glass, Kameron Glass and Kyleigh Glass, and Misty Cruz on behalf of Julian Cruz, who bring this Civil Action for Damages under the Federal Civil RICO Statute, 18 U.S.C. § 1964(c), for RICO violations of § 1962(c) and § 1962(d), as well as the Louisiana retaliatory discharge statutes, La. Rev. Stat. § 23:967, La. Rev. Stat. §30:2027, La. CC. Art. 2315.1 and La. CC. Art. 2315.2. For their case, Plaintiffs respectfully plead the following:

**JURISDICTION AND VENUE**

1.       The jurisdiction of this Court is conferred and invoked pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq*., (specifically 18 U.S.C. § 1964(c)), and 28 U.S.C. § 1331.

2.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Louisiana law claims regarding unlawful discharge, retaliation, wrongful death and survival action.

3.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because the majority of the events giving rise to Plaintiffs' claims occurred within the territory of the Eastern District of Louisiana.

## PARTIES, PERSONS, PLACES AND ENTITIES

4.     Plaintiff, Barbara Glass (hereinafter "Ms. Glass"), is a citizen of the United States and resident of the State of Louisiana, Parish of Caldwell. Ms. Glass is the wife of Robert Glass (hereinafter "Mr. Glass"), now deceased. Shortly after being retaliated against by Defendants, and until his termination on or about September 3, 2015, Mr. Glass was employed as an operator for Island Operating Co., Inc. Ms. Glass is administratrix of Mr. Glass's Succession and also natural tutrix of their three minor children, Karli Glass, Kameron Glass and Kyleigh Glass.

5.     Plaintiff, Misty Cruz, (hereinafter "Ms. Cruz"), is a citizen of the United States and resident of the State of South Carolina, County of Lexington. Ms. Cruz appears herein on behalf of Mr. Glass's and her minor child, Julian Cruz.

6.     Defendant, Fieldwood Energy, LLC (hereinafter referred to as "Fieldwood"), is a privately-held domestic limited liability corporation incorporated in Delaware, doing business in the State of Louisiana and engaged in interstate commerce with its principal place of business located at 2000 West Sam Houston Parkway South Suite 1200, Houston, Texas 77042.

7.     Defendant, Island Operating Co., Inc. (hereinafter referred to as "Island Operating"), is a privately-held domestic corporation incorporated in Louisiana, doing business

in the State of Louisiana and engaged in interstate commerce with its principal place of business located at 108 Zachary Drive, Scott, LA 70583.

8.      Defendant, Shamrock Management, LLC, (hereinafter referred to as "Shamrock"), is a privately-held limited liability corporation incorporated in Louisiana doing business in the State of Louisiana and engaged in interstate commerce with its principal place of business located at 4800 Highway 311, Houma, Louisiana 70360.

9.      Main Pass 310 A (hereinafter "MP-310 A") is a production and distribution platform with several feeder wells, platforms and pipelines running to and through it, one of which is an unmanned platform, Main Pass 310 JA (hereinafter "MP-310 JA").

10.     Defendant, Patrick Huse (hereinafter "Mr. Huse"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Huse was employed as a lead operator and a person in charge for Fieldwood. Mr. Huse violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

11.     Defendant, John Riley (hereinafter "Mr. Riley"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Riley was employed as a production foreman for Fieldwood. Mr. Riley violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

12.     Defendant, Richard Tate (hereinafter "Mr. Tate"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Tate was employed as senior operator for Fieldwood. Mr. Tate violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

13.     Defendant, Greg Falgout (hereinafter "Mr. Falgout"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Falgout was employed as president of Island Operating. Mr. Falgout violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

14.     Defendant, John Saldana (hereinafter "Mr. Saldana"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Saldana was employed as a project manager for Island Operating. Mr. Saldana violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

15.     Defendant, Craig Robichaux (hereinafter "Mr. Robichaux"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action,

Mr. Robichaux was employed as an account manager for Shamrock Management, LLC. Mr. Robichaux violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

16.     Defendant, Jason Lyons (hereinafter "Mr. Lyons"), is a citizen of the United States whose place of residence is currently unknown. At all times relevant to this action, Mr. Lyons was employed as general counsel for Shamrock Management, LLC. Mr. Lyons violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud.

17.     Keith M. Greene, Sr. (hereinafter "Mr. Greene") is a citizen of the United States and resident of the State of Louisiana, Parish of St. Martin. At all times relevant to this action, Mr. Greene was employed as an operator by Shamrock and working for Fieldwood on MP-310 A. Mr. Greene worked as an operator until he was wrongfully terminated on December 3, 2015, for cooperating with federal authorities in their investigation of the criminal enterprise made the basis of this litigation.

18.     The Bureau of Safety and Environmental Enforcement (hereinafter "BSEE") is a federal agency responsible for ensuring that all oil and gas operations on the Outer Continental Shelf comply with environmental and safety regulations. BSEE inspectors document violations by issuing Incident of Non-Compliance reports, which are punishable by civil penalties and fines

for each day in violation, shut-ins of platforms, wells, equipment, and pipelines, suspensions of operations, cancellations of leases, removal of operator status, and referral to criminal law enforcement agencies.

19.     The Office of Inspector General, U.S. Department of the Interior (hereinafter "DOI OIG") is a federal agency responsible for investigating allegations of fraud, waste, abuse, misconduct, mismanagement and/or criminal activity involving the U.S. Department of the Interior.

20.     The U.S. Environmental Protection Agency, Criminal Investigation Division (hereinafter "EPA CID"), is a federal law enforcement agency responsible for enforcing environmental laws and investigating environmental crime that threatens the health and environment of U.S. citizens.

## FACTUAL ALLEGATIONS

21.     Fieldwood is a Texas-based limited liability company that develops oil assets in the Gulf of Mexico and throughout the Gulf Coast region. With 750 employees, 1,000 wells, and 500 leases covering over 2 million gross acres, Fieldwood holds the largest assets base in the Gulf of Mexico.

22.     Since its inception in 2013, Fieldwood has built its business reputation and derived substantial profits by representing itself as an industry leader in safety and environmental compliance.

23.     Fieldwood's widely publicized "Safety & Environmental Policy" notes the company's commitment to "protect the environment in which we operate" and to conduct all work "in compliance with Fieldwood's Safety and Environmental Management System (SEMS)" and "all federal, state, local, and industry environmental, health, safety rules and regulations."

24.     Fieldwood's Safety and Environmental policy also emphasizes that "everyone must feel empowered to raise concerns without fear of retaliation or intimidation" and maintains that "everyone has Stop Work Authority and is expected to use it."

25.     Island Operating provides oil and gas production services and laborers to companies throughout the United States. Island Operating manages over $1 billion in client assets and employs 1,300 workers in oil platform operations.

26.     Since its inception in 1986, Island Operating has built its business reputation and derived substantial profits by representing itself to clients and regulators as an industry leader in safety and environmental compliance.

27.     Island Operating's widely publicized marketing materials note that the company holds a Safety Award for Excellence, issued by the U.S. Department of the Interior "to recognize and honor companies that make a concerted effort to train and motivate their employees to conduct offshore operations in a safe and environmentally responsible manner."

28.     Through its website, Island Operating holds itself out to potential clients and the general public as "welcomed by industry regulators because of [its] total commitment to compliance."

29.     Shamrock is a Louisiana-based company that provides oil and gas production and pipeline operators for offshore, deepwater and land operations in the Gulf of Mexico and internationally.

30.     Since its inception in 1997, Shamrock has built its business reputation and derived substantial profits by representing itself as an industry leader in safety and environmental compliance.

31.     Shamrock's widely publicized company mission is "to ensure that we do not

pollute the environment," to "provide the resources required to protect the environment," and to "demonstrate genuine concern for the environment."

32.     Shamrock's supposed "Stop Work Authority" policy expressly obligates all oil platform workers "to stop any work that is deemed unsafe without the fear of retaliation." Further, "any form of retribution or intimidation directed at any individual for using stop work authority will not be tolerated."

33.     At all times material to this lawsuit, Island Operating and Shamrock were engaged by Fieldwood to provide operators, mechanics, and electricians on Fieldwood's oil production platform, MP-310 A, located off the Louisiana coast in the Gulf of Mexico.

34.     MP-310 JA is an unmanned Fieldwood platform with wells that run to and through MP-310 A. At all times material hereto, MP-310 JA was required to be visited by an operator on a daily basis to ensure that it was operating safely and not discharging any pollution into the Gulf of Mexico.

35.     On August 15, 2014, Mr. Glass was hired as an operator by Island Operating. Mr. Glass was employed by Island Operating and working for Fieldwood on MP-310 A as an operator until he was wrongfully terminated in the summer of 2015 by Fieldwood and Island Operating.

36.     On December 22, 2014, Keith Greene ("Mr. Greene") was hired as an operator by Shamrock. Mr. Greene worked as an operator for Shamrock from December 22, 2014 until December 3, 2015, when he was wrongfully terminated by Fieldwood and Shamrock for cooperating with a federal investigation into the incidents made the basis of this litigation.

37.     Starting no later than February of 2015, Fieldwood falsified visitation logs for MP-310 JA by fraudulently forging signatures of operators who it claimed had visited MP-310

JA, but in fact, had not. BSEE requires these visitation logs to be kept contemporaneously and be readily available for inspection.

38.     From at least March of 2015 forward, Fieldwood regularly manipulated overboard water samples from MP-310 A and fraudulently represented that those water samples were free of contamination when, in fact, they had been filtered, or "polished", to meet BSEE and other environmental regulations.

39.     On Tuesday, July 14, 2015, Mr. Glass began the first day of a fourteen-day hitch on MP-310 A, under the employ and supervision of Fieldwood and Island Operating.

40.     On Tuesday, July 14, 2015, Mr. Greene began the first day of a fourteen-day hitch on MP-310 A, under the employ and supervision of Fieldwood and Shamrock.

41.     On the morning of Friday, July 17, 2015, BSEE Inspector Alan Williams ("Mr. Williams") arrived at MP-310 A to conduct an inspection of the platform.

42.     The BSEE is a federal agency that ensures all oil and gas operations on the Outer Continental Shelf comply with environmental and safety regulations. Inspectors document any violations by issuing an Incident of Non-Compliance ("INC") report to the operator, who must respond by indicating how and when the violation will be corrected.

43.     BSEE INCs are punishable by civil penalties and fines for each day in violation, shut-ins of platforms, wells, equipment, and pipelines, suspensions of operations, cancellations of leases, removal of operator status, and referral to criminal law enforcement agencies.

44.     Mr. Williams's July 17th inspection of MP-310 A uncovered multiple violations of environmental regulations, which resulted in three INCs issued to Fieldwood. Notably, Mr. Williams observed that the platform's "Free Water Knockout" system failed to operate properly during multiple tests. In offshore drilling, the Free Water Knockout separates oil and gas from

water to avoid pollution into the Gulf of Mexico. An oil emulsion flows to the Free Water Knockout, where it is separated before being pumped into a tank and treated again in a connected flotation cell called a "WEMCO." The WEMCO removes any residual oil. Together, the devices work to discharge clean water back into the sea.

45.     Mr. Williams's July 17th inspection of MP-310 A also uncovered a problem with the Pressure Safety High on the MBF-660 Fuel Gas Scrubber.  During the inspection, Mr. Williams discovered that the device failed to operate as required. At a certain pressure, the device is supposed to trip a pilot, sound an alarm, and shut-in certain devices; it is the first line of defense in preventing over-pressure of the MBF-660 Fuel Gas Scrubber.  The reason the Pressure Safety High did not function properly is because a plug had been installed by Fieldwood to prevent the device from tripping and shutting-in devices that could cause production on the platform to stop. While Mr. Williams was distracted, Mr. Huse removed the plug so the device would trip. Mr. Huse then asked Mr. Williams to test the device again, whereupon the Pressure Safety High tripped the pilot, sounded the alarm and otherwise functioned as it should have when a pressure threshold is exceeded.

46.     On Sunday, July 19, 2015, Mr. Glass and other operators observed an oil sheen on the surface waters surrounding the platform and reported it to their Fieldwood supervisors.

47.     Later on Sunday, July 19, 2015, the Fieldwood production foreman, Mr. Riley, conducted a "fly-by" over MP-310 A to investigate the oil sheen. Upon his return to the platform, Mr. Riley stated to Mr. Glass and the other operators: "You can't tell it's coming from us."

48.     On Monday, July 20, 2015, Mr. Glass and the other operators again reported to their supervisor, the Fieldwood Person in Charge ("PIC"), Mr. Huse, that the platform was still

sheening. Mr. Glass, Mr. Greene and the other operators were instructed by the PIC, Mr. Huse, to initiate a "hydrochloric acid treatment" of MP-310 A's Free Water Knockout and WEMCO.

49.     On Tuesday, July 21, 2015, even after the acid treatment, oil continued to be discharged from MP-310 A's Free Water Knockout and WEMCO systems into the Gulf of Mexico. Mr. Glass and Mr. Greene each logged overtime hours on their time sheets on July 21, 2015 citing problems with the platform's overboard water systems.

50.     Additionally, Mr. Glass and Mr. Greene collected samples from the overboard water system that was discharging into the Gulf of Mexico and observed that the water samples were visibly "cloudy." Mr. Glass immediately reported his findings to the Fieldwood PIC, Mr. Huse who ordered that the samples be destroyed and not recorded, reported or sent to the lab, as required.

51.     On Wednesday, July 22, 2015, despite clear indications that the existence of oil in the overboard water system could not be resolved using temporary fixes, Mr. Huse instructed Mr. Glass, Mr. Greene, and the other operators to remove sand build-up from the WEMCO in lieu of a complete platform shut-in, hoping the sheening would dissipate.

52.     After pumping sand from the WEMCO, Mr. Glass and the other operators collected additional samples from the overboard water system of MP-310 A and observed that the water's appearance had not changed: it was still turbid, indicating oil contamination.

53.     On the evening of Wednesday, July 22, 2015, Mr. Glass and the other operators advised Mr. Huse that there was still visible oil in the overboard water samples and that the platform was still sheening. Mr. Huse instructed them again to destroy the samples, not report the contamination as required or send the samples to the lab, but instead that they were to "take care of it in the morning," since sheens are not visible at night.

54.     On the morning of Thursday, July 23, 2015, Mr. Glass, Mr. Greene, and the other operators observed that the platform was still sheening. Mr. Huse gathered all platform personnel for a safety meeting and instructed the operators to leave all wells online and to continue attempting to identify a potential solution to the ongoing oil pollution.

55.     Mr. Glass insisted to Mr. Huse that the oil spill was beyond their control and that Fieldwood had no choice but to stop production immediately. Mr. Huse refused to activate the Emergency Shut Down ("ESD"), and again ordered the operators to continue production.

56.     Mr. Glass, Mr. Greene and the other operators conducted a separate meeting outside the presence of Mr. Huse, wherein they decided that continuing to pollute the Gulf of Mexico and continuing production operations in violation of environmental and safety regulations could no longer be tolerated, despite Mr. Huse's instruction to keep the wells online. The operators decided as a group that Mr. Glass would be the one to initiate the ESD of the facility, as this was the only remaining option to stop the ongoing pollution.

57.     On the morning of Thursday, July 23, 2015, Mr. Glass asserted his supposed Stop Work Authority and initiated the ESD, shutting off production for all wells connected to MP-310 A.

58.     After the ESD, Mr. Huse became enraged and attempted to override Mr. Glass's ESD by instructing the operators to bring all wells back online immediately.

59.     Also after the ESD, Mr. Huse received a phone call from the BSEE inspectors stating that they would be returning to MP-310 A to finish their inspection of the platform, as well as another platform in the area which they had forgotten to inspect the previous week, MP-310 JA.

60.     Mr. Huse then called another meeting with all workers on the platform. Mr. Huse

instructed everyone that during the BSEE follow-up inspection, should they be asked why the platform had been shut-in, they were to lie about why the wells had been taken offline. Mr. Huse ordered everyone to state that the wells had been shut-in to prepare for construction, cleaning and potentially replacing the WEMCO.

61.     Later in the day of Thursday, July 23, 2015, Mr. Glass submitted a safety report documenting the oil spill on MP-310 A. Mr. Glass truthfully advised his supervisors that the malfunctioning Free Water Knockout and WEMCO had caused an oil spill and that he responded by initiating an ESD. Attempting to mitigate likely retaliation against him by Fieldwood and Island Operating, Mr. Glass stated that Mr. Huse subsequently "concurred" with the shut-in as a necessary preparation for "cleaning and construction" on the platform, which was similar to the story Mr. Huse had previously instructed everyone on the platform to tell BSEE.

62.     In fact, the WEMCO was not scheduled to be replaced as of July 23, 2015, although it sorely needed to be. At this time, Fieldwood was experiencing an unplanned and unexpected shut-in of another of its major producing wells, the Bullwinkle, and did not want two major producing platforms shut-in at the same time. Consequently, Fieldwood was polluting the Gulf of Mexico solely to mitigate its loss of income until Bullwinkle could be brought back online.

63.     On Thursday, July 23, 2015, after initiating the ESD, Mr. Glass called his supervisor at Island Operating, Mr. Saldana, to tell him that he had used his supposed Stop Work Authority by initiating an ESD to stop the platform from sheening.

64.     BSEE inspectors arrived on MP-310 A later on Thursday, July 23, 2015 to finalize the inspection of MP-310 A, inspect MP-310 JA and to review the corrections to the INCs issued on the BSEE inspection from the prior week.

65.     Per the instruction from Mr. Huse, personnel on MP-310 A lied to BSEE inspectors regarding the reason for the platform being shut-in and falsely represented that the wells were shut-in in preparation for replacing the WEMCO.

66.     Despite knowing that the Free Water Knockout was still malfunctioning and, together with the WEMCO, was causing the oil sheen surrounding MP 310-A, Mr. Huse falsely reported to BSEE that Fieldwood had repaired the Free Water Knockout and that the problem with the Pressure Safety High on the MBF-660 Fuel Gas Scrubber had been resolved on July 17, 2015. The fraudulent report which falsely stated that the Free Water Knockout was operating properly and which failed to state the Pressure Safety High on MBF-660 did not trip due to the improper installation of plug (which would have been a very serious P-103 violation), was signed by Mr. Huse on July 23, 2015 and submitted to BSEE.

67.     On July 26, 2015, Mr. Glass departed MP-310 A to seek treatment for a staph infection.

68.     On August 11, 2015, Mr. Glass arrived to the heliport to return to work on MP-310 A. Mr. Glass was instructed to return home to get his physician's note which verified his treatment for the staph infection. Mr. Glass was subsequently required to take a later than normal helicopter flight to MP-310 A. Mr. Glass was then flown to MP-310 A to continue his hitch.

69.     On August 11, 2015, Mr. Glass was sent home by Mr. Huse, Mr. Tate and Mr. Riley in retaliation for his previous actions in using his supposed Stop Work Authority by initiating the ESD to prevent MP-310 A from spilling oil into the Gulf of Mexico and was subsequently forbidden from working for Fieldwood on August 12, 2015.

70.     Between August 12, 2015 and August 20, 2015, Mr. Falgout and Mr. Saldana complied with Fieldwood's expulsion of Mr. Glass and refused to assign Mr. Glass to any

platforms in the Gulf of Mexico.

71.     On August 20, 2015, Mr. Glass emailed Mr. Falgout, President of Island Operating, explaining that he was being retaliated against for using his supposed Stop Work Authority by initiating the ESD on MP-310 A and for reporting the oil spill in the Gulf of Mexico.

72.     On or about September 3, 2015, Island Operating, Mr. Falgout and Mr. Saldana formally terminated Mr. Glass from employment.

73.     After being terminated by Fieldwood and Island Operating, Mr. Glass contacted federal agents with the DOI OIG and the EPA CID regarding Defendants' criminal enterprise.

74.     On October 6, 2015, Mr. Greene was contacted by the same federal agents that were investigating the claims brought to their attention by Mr. Glass.

75.     On November 3, 2015, Mr. Lyons and Mr. Robichaux arranged to meet with Mr. Greene to elicit the names and organizations of the federal agents with whom they knew Mr. Greene had spoken, to ascertain what he had already told the authorities and to improperly influence any future testimony and/or cooperation with those same federal agencies.

76.     On December 3, 2015, Mr. Greene was fired from Shamrock and Fieldwood due to his cooperation with federal authorities in their investigation of the criminal enterprise made the basis of this litigation.

77.     On February 10, 2016, as a direct result of the anxiety, depression and immense stress thrust upon Mr. Glass by virtue of Defendants' actions, Mr. Glass sadly succumbed to an uncharacteristic use of drugs and perished.

## The RICO Enterprise

78.     Defendants Fieldwood, Island Operating, Shamrock, Mr. Huse, Mr. Riley, Mr.

Tate, Mr. Falgout, Mr. Saldano, Mr. Robichaux, and Mr. Lyons actively participated in a scheme to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A from exposing the fraud, which enterprise hereinafter is referred to as the "RICO Enterprise." Defendants perpetuated and benefited from the "RICO Enterprise" through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

79.     Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise, and in furtherance thereof committed two or more predicate acts after having come to a mutual understanding to attempt to accomplish a common and unlawful plan while being associated with the RICO Enterprise.  The actions of Defendants as against Mr. Glass, and as described herein and above, were in furtherance of Defendants' conspiracy and in violation of 18 U.S.C. §1962(d).

80.     At all times material hereto, the RICO Enterprise was the passive instrument of Defendants' racketeering activities and constitutes an "enterprise" as that term is defined in 18 U.S.C. §1961(4), separate and distinct from the individual Defendants named herein.

81.     From no later than February of 2015, Defendants and others, known and unknown, who were associated with the RICO Enterprise, which was and is engaged in activities which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the RICO Enterprise through a pattern of racketeering activity by committing two or more separate but related predicate acts of racketeering as set forth herein.

82.     Defendants' predicate acts constitute a threat of continuing racketeering activity

as the RICO Enterprise, although currently under investigation by Federal authorities, has heretofore not been stopped from continuing to engage in the pattern of unlawful conduct outlined herein.

83.     Mr. Glass was directly injured by Defendants' racketeering activity and by extension, Plaintiffs, Barbara Glass, as Administratrix of the Succession of Robert Glass, and as natural tutrix of Karli Glass, Kameron Glass and Kyleigh Glass, and Misty Cruz on behalf of Julian Cruz, were similarly directly injured by Defendants' racketeering activity which result in Mr. Glass's unlawful termination, inability to be employed and ultimately his death.

## PREDICATE ACTS & THE PATTERN OF RACKETEERING ACTIVITY

84.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S. §1341 (relating to mail fraud), 18 U.S.C. §1343 (relating to wire fraud), 18 U.S.C. §1512 (relating to tampering with a witness, victim, or informant, and 18 U.S.C. §1513(e) (relating to interference with a person's employment). As set forth in greater detail below, Defendants engaged in conduct violating §1341, §1343, §1512, and §1513 to effectuate their unlawful scheme.

85.     Defendants' acts formed a pattern of conduct through which they used the RICO Enterprise to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A, including Mr. Glass, from exposing the fraud.

86.     The pattern of Defendants' illegal racketeering activity, as defined by 18 U.S.C. §1961(1) and (5) and 18 U.S.C. §1341, §1343, §1512, and/or §1513 are based on the following facts:

a. From at least February of 2015, Mr. Huse, Mr. Tate and/or Mr. Riley falsified operator visitation logs to MP-310 JA by forging or directing the forgery of the signatures of operators, including Mr. Glass and Mr. Greene, thereby fraudulently misrepresenting to BSEE that MP-310 JA was being visited as required on a daily basis, in furtherance of maintaining the illusion that Defendants' RICO enterprise was an environmentally safe oil production operation.

b. From at least February of 2015, Mr. Huse, Mr. Tate and/or Mr. Riley manipulated or directed to manipulate overboard water samples by filtering, or "polishing", samples through a makeshift contraption that removed contaminates in the water, and then fraudulently submitted the "polished" samples for testing and fraudulently recorded compliance with the permit requirements of the EPA National Pollutant Discharge Elimination System ("NPDES").

c. On July 17, 2015, during a BSEE inspection of MP-310 A's Pressure Safety High on the MBF-660 Fuel Gas Scrubber, Mr. Williams discovered that the device failed to operate as required. The reason the Pressure Safety High did not function properly is because a plug had been installed by Fieldwood to prevent the device from tripping and shutting-in devices that could cause production on the platform to stop. While Mr. Williams was distracted, Mr. Huse removed the plug so the device would trip. Mr. Huse then asked Mr. Williams to test the device again, whereupon the Pressure Safety High functioned as it should. Had Mr. Williams noticed the plug, BSEE would have issued a P-103 violation to Fieldwood, which has serious consequences both financially and criminally.

d. On July 23, 2015, Mr. Huse instructed the entire crew on the platform of MP-310

A to fraudulently misrepresent to BSEE inspectors that the platform was shut down due to planned construction, cleaning and replacement of the platform's WEMCO, instead of the truth which was that Mr. Glass, Mr. Greene and the other operators initiated an ESD because they could not control the discharge of oil from MP-310 A's overboard water system.

e.  On July 23, 2015, Mr. Huse knowingly falsified a BSEE "Incidents of Non-Compliance Investigation Report" by claiming that MP-310 A's Free Water Knockout system had been repaired and was functioning properly as of July 17, 2015, which report was submitted to BSEE via mail, e-mail and/or facsimile.

f.  On July 23, 2015, Mr. Huse knowingly falsified a BSEE "Incidents of Non-Compliance Investigation Report" regarding MP-310 A's Pressure Safety High on the MBF-660 Fuel Gas Scrubber, stating that the "sensor was reset & retested." In fact, the reason the device did not trip and trigger an alarm as intended was because a plug had been installed specifically to prevent the device from tripping, which would stop production by automatically shutting down relevant systems. Mr. Huse did not simply reset and retest the device; he removed the plug when Mr. Williams was not looking so that the device would function properly. If Mr. Williams had noticed the plug installed to prevent the device from triggering shut-ins, a P-103 violation would have been issued, which carries severe financial and criminal penalties. The report was submitted to BSEE via mail, e-mail and/or facsimile.

g.  The purpose of submitting the fraudulent reports completed by Mr. Huse was to circumvent BSEE fines for incidents of non-compliance, to avoid potential

criminal liability, and to derive substantial personal financial benefit from keeping oil wells online, all in furtherance of the RICO Enterprise.

h. Beginning on August 12, 2015, Defendants conspired to terminate Mr. Glass's employment with Fieldwood and, consequently, Island Operating, in direct response to Mr. Glass being the individual who physically initiated the ESD on July 23, 2015 and for his desire to tell the truth regarding the events that occurred from July 16, 2015 through July 23, 2015.

i. On August 12, 2015, Defendants Fieldwood, Mr. Huse, Mr. Tate and Mr. Riley forbade Mr. Glass from working on Fieldwood platforms.

j. On September 3, 2015, Defendants Island Operating, Mr. Falgout and Mr. Saldana terminated Mr. Glass from employment with Island Operating.

k. Shortly after being terminated, Mr. Glass contacted federal agents with the DOI OIG and the EPA CID regarding Defendants' criminal enterprise.

l. In direct response to Mr. Glass's cooperation with federal authorities, Defendants conspired to prevent Mr. Glass from obtaining employment in the oil & gas industry by blackballing and disparaging Mr. Glass to other potential employers in the Gulf of Mexico.

m. On October 6, 2015, Mr. Greene was contacted by the same federal agents that were investigating the claims brought to their attention by Mr. Glass. Mr. Greene cooperated with federal agents regarding their investigation into Defendants' criminal enterprise.

n. After learning of Mr. Greene's cooperation with federal agents, Defendants conspired to terminate Mr. Greene's employment with Fieldwood and Shamrock.

o.  On November 3, 2015, Defendants arranged for Mr. Lyons and Mr. Robichaux to meet with Mr. Greene to elicit the names and organizations of the federal agents with whom Defendants knew Mr. Greene had spoken, to ascertain what he had already told the authorities and to improperly influence any future testimony and/or cooperation with those same federal agencies.

p.  Because of Mr. Greene's cooperation with federal authorities, on December 3, 2015, Defendants terminated Mr. Green from employment with Fieldwood and Shamrock.

q.  In direct response to Mr. Greene's cooperation with federal authorities, Defendants conspired to prevent Mr. Greene from obtaining employment in the oil & gas industry by blackballing and disparaging Mr. Greene to other potential employers in the Gulf of Mexico.

87.  All predicate acts committed by Defendants are related and were committed with a common scheme in mind: to fraudulently misrepresent MP-310 A, including its feeder wells, platforms and pipelines, as an environmentally safe oil production platform, to defraud the federal government and United States taxpayers through that misrepresentation, and to silence workers on MP-310 A, including Mr. Glass, from exposing the fraud, which acts include the following:

a.  Defendants used mail, facsimile and/or electronic messages to deliver fraudulent environmental compliance reports to BSEE to conceal pollution in the Gulf of Mexico caused by MP-310 A's ineffective Free Water Knockout, WEMCO and overboard water system, in violation of 18 U.S.C. §1341 and/or §1343.

b.  Defendants used mail, facsimile and/or electronic messages to deliver fraudulent

environmental compliance reports to BSEE to conceal a P-103 violation and/or incident of non-compliance regarding MP-310 A's Pressure Safety High on the MBF-660 Fuel Gas Scrubber, which had been jury rigged not to trip via implementation of a plug, which was removed while the BSEE inspector was distracted, in violation of 18 U.S.C. §1341 and/or §1343.

c. It was part of Defendants' scheme to attempt to persuade Mr. Glass and Mr. Greene in a corrupt manner from exposing the Defendants' illegal racketeering activity and violations of federal environmental regulations by extortion, threat of economic harm, disparagement, blackballing and undue influence, in violation of 18 U.S.C. 1512(b)(3).

d. It was part of Defendants' scheme to attempt to persuade Mr. Glass in a corrupt manner not to expose the Defendants' illegal activities by extortion, threat of economic harm, disparagement, blackballing and undue influence while the BSEE, EPA CID and DOI OIG were investigating Defendants' conduct, in violation of 18 U.S.C. 1512(b)(3).

e. It was part of Defendants' scheme to attempt to persuade Mr. Greene in a corrupt manner not to expose the Defendants' illegal activities by extortion, threat of economic harm, disparagement, blackballing and undue influence while the BSEE, EPA CID and DOI OIG were investigating Defendants' conduct, in violation of 18 U.S.C. 1512(b)(3).

f. It was part of Defendants' scheme to interfere with Mr. Glass's lawful employment and livelihood by terminating Mr. Glass in retaliation for providing truthful information to BSEE, EPA CID and DOI OIG relating to Defendants'

fraudulent scheme, in violation of 18 U.S.C. 1513(e) and (f).

g. It was part of Defendants' scheme to interfere with Mr. Greene's lawful employment and livelihood by terminating Mr. Greene in retaliation for providing truthful information to BSEE, EPA CID and DOI OIG relating to Defendants' fraudulent scheme, in violation of 18 U.S.C. 1513(e) and (f).

88.     As a result of their pattern of racketeering activity, Defendants have made unlawful and unwarranted financial gains and have directly interfered with Mr. Glass's lawful employment and livelihood by blackballing and disparaging Mr. Glass to other potential employers in the Gulf of Mexico.

89.     As a result of their pattern of racketeering activity, Defendants have made unlawful and unwarranted financial gains and have directly interfered with Mr. Greene's lawful employment and livelihood by blackballing and disparaging Mr. Greene to other potential employers in the Gulf of Mexico.

90.     As set forth above, Defendants are employed and/or derive profit from the RICO enterprise which engages in interstate commerce by virtue of its production, transportation and sale of oil and gas from wells in the Gulf of Mexico, including, but not limited to MP-310 A and MP-310 JA.

91.     As set forth above, Defendants' pattern of racketeering is comprised of predicate acts including mail fraud, wire fraud, witness tampering, and employment retaliation.

92.     As set forth above, Defendants engaged in a pattern of racketeering activity for the common purpose of benefitting financially from misrepresenting MP-310 A as an environmentally safe oil platform, defrauding United States taxpayers through that misrepresentation, and silencing Mr. Glass and Mr. Greene from exposing the fraud.

93.     Defendants' conspiracy to avoid criminal liability and benefit financially from misrepresenting MP-310 A as an environmentally safe oil platform, to defraud United States taxpayers through that misrepresentation, and to silence Mr. Glass and Mr. Greene from exposing that concealment, as described above, violates 18 U.S.C. 1962(d).

94.     Each Defendant agreed to participate, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity comprised of numerous individual and collective acts of mail fraud, wire fraud, witness tampering, and employment retaliation, and each Defendant participated in violating 18 U.S.C. 1962(c).

95.     Defendants' conduct did directly and proximately cause irreparable damage to Mr. Glass's lawful employment and mental and physical well-being.

96.     Defendants are jointly and severally liable to Plaintiffs for treble damages, together with all costs for this action, and reasonable attorney's fees as provided for in 18 U.S.C. 1964.

97.     Plaintiffs are entitled to damages, court costs, and pre and post-judgment interest at the legally permissible limit.

## LOUISIANA WHISTLEBLOWER CLAIMS

98.     Plaintiffs bring this action against Defendants, Fieldwood and Island Operating, under Title 23 of the Louisiana Revised Statutes, particularly La. R.S. 23:967, Employee protection from reprisal; prohibited practices; remedies.

99.     Mr. Glass, during the instances alleged herein and above, repeatedly advised Fieldwood of violations of law occurring on the MP-310 A in a good faith effort to remedy those problems, comply with state law, and prevent damage to health and human safety, as well as the environment, caused by the ongoing oil spill in the Gulf of Mexico due to Fieldwood's flagrant

refusal to shut down operations on MP-310 A and its connecting facilities.

100.   On July 23, 2015, after having reported the oil sheen to Fieldwood countless times and pleading with Mr. Huse to shut down production on MP-310 A to prevent further pollution in the Gulf of Mexico, Mr. Glass asserted his Stop Work Authority and initiated an ESD of MP 310-A and its connecting facilities, thereby refusing to participate in unlawful activities and threatening to disclose to BSEE inspector Allen Williams the unlawful practices attributing to the oil spill.

101.   Immediately after activating the ESD, Mr. Glass called his supervisor at Island Operating, Mr. Saldana, to report the oil spill and his use of Stop Work Authority and activation of the ESD.

102.   As a direct result of Mr. Glass's actions, Fieldwood terminated Mr. Glass on August 12, 2015.

103.   Island Operating, complied with Fieldwood's termination of Mr. Glass, ending Mr. Glass's employment on August 12, 2015, and officially terminating Mr. Glass on or about September 3, 2015, for pretextual reasons.

104.   Fieldwood and Island Operating terminated Mr. Glass without any cause other than for the sole purpose of reprisal for actions taken by Mr. Glass which are protected by La. R.S. 23:967(A).

## LOUISIANA ENVIRONMENTAL WHISTLEBLOWER CLAIMS

105.   Plaintiffs bring this action against Defendants, Fieldwood and Island Operating, under Title 30 of the Louisiana Revised Statutes, particularly La. R.S. 30:2027, Environmental violations reported by employees; reprisals prohibited.

106.   Mr. Glass disclosed to Fieldwood and Island Operating and threatened to disclose

to BSEE inspector Allan Williams activities that he knew to be in violation of environmental laws, rules and regulations.

107.   By asserting Stop Work Authority and activating the ESD, Mr. Glass refused to participate in these activities which he knew to be creating an extraordinarily unsafe and dangerous condition and in violation of environmental laws and regulations and threatened to disclose these unlawful activities to BSEE inspector Allan Williams.

108.   As a result of Mr. Glass's refusal to participate in what he knew to be activities, policies and practices that were in violation of environmental laws, rules and regulations, and threats to disclose these unlawful activities to BSEE, Fieldwood and Island Operating ended Mr. Glass's employment on August 12, 2015.

109.    Island Operating officially terminated Mr. Glass on or about September 3, 2015, for pretextual reasons.

110.   Fieldwood's and Island Operating's termination of Mr. Glass was without any cause other than for the sole purpose of reprisal for actions taken by Mr. Glass which are protected by La. R.S. 30:2027.

## **WRONGFUL DEATH**

111.   Plaintiff, Barbara Glass, as Administratrix of the Succession of Robert Glass, brings a claim for Wrongful Death pursuant to La. CC. Art. 2315.2.

112.   As a direct and proximate result of the conduct of the RICO Enterprise, Mr. Glass suffered enhanced mental anguish, depression, anxiety, and distress immediately following his wrongful discharge from employment by Fieldwood and Island Operating until the time of his death on February 10, 2016.

113.   Defendants had a duty not to take retaliatory action or engage in prohibited

retaliatory practices, including firing, laying off, or any other discriminatory acts, against Mr. Glass for truthfully reporting Defendants' actual violations of state and federal laws, refusing to participate in unlawful activities by way of asserting his Stop Work Authority, reporting environmental and safety violations to his supervisors and government agencies, and participating in federal investigations of Defendants' criminal activity.

114.    Defendants breached their duty to Mr. Glass by attempting to persuade Mr. Glass in a corrupt manner not to expose the Defendants' illegal activities by extortion, threat of economic harm, disparagement, blackballing and undue influence.

115.    Defendants Fieldwood and Island Operating further breached their duty to Mr. Glass by wrongfully terminating him from employment during the summer of 2015 as a direct result of his protected activities in reporting violations of state and federal environmental and safety laws and regulations.

116.    Defendants' breach of their duty to Mr. Glass was a substantial factor and/or cause in fact of Mr. Glass's death on February 10, 2016.

117.    As a direct result of Defendants' breach of their duty to Mr. Glass, Mr. Glass sustained injury to his mind and body including, but not limited to, undue stress, strain, mental anguish, financial hardship,  loss of employability, loss of earning capacity and ultimately his death, as well as other economic and non-economic damages.

## SURVIVAL ACTION

118.    Plaintiffs, Barbara Glass, individually and as natural tutrix of Karli Glass, Kameron Glass and Kyleigh Glass, and Misty Cruz on behalf of Julian Cruz, bring this survival action pursuant to La. CC. Art. 2315.1.

119.    As a direct and proximate result of the conduct of the RICO Enterprise, Mr. Glass

suffered enhanced mental anguish, depression, anxiety, and distress immediately following his wrongful discharge from employment by Fieldwood and Island Operating until the time of his death on February 10, 2016.

120.   Defendants had a duty not to take retaliatory action or engage in prohibited retaliatory practices, including firing, laying off, or any other discriminatory acts, against Mr. Glass for truthfully reporting Defendants' actual violations of state and federal laws, refusing to participate in unlawful activities by way of asserting his Stop Work Authority, reporting environmental and safety violations to his supervisors and government agencies, and participating in federal investigations of Defendants' criminal activity.

121.   Defendants breached their duty to Mr. Glass by attempting to persuade Mr. Glass in a corrupt manner not to expose the Defendants' illegal activities by extortion, threat of economic harm, disparagement, blackballing and undue influence.

122.   Defendants Fieldwood and Island Operating further breached their duty to Mr. Glass by wrongfully terminating him from employment during the summer of 2015 as a direct result of his protected activities in reporting violations of state and federal environmental and safety laws and regulations.

123.   Defendants' breach of their duty to Mr. Glass was a substantial factor and/or cause in fact of Mr. Glass's death on February 10, 2016.

124.   As a direct result of Defendants' breach of their duty to Mr. Glass, Mr. Glass sustained injury to his mind and body including, but not limited to, undue stress, strain, mental anguish, financial hardship, loss of employability, loss of earning capacity and ultimately his death, as well as other economic and non-economic damages.

## DAMAGES

125.    As a direct result of Defendant's violations of § 1962(c) and § 1962(d) of the

Racketeer Influenced and Corrupt Organizations Act, as well as Fieldwood's and Island's

wrongful termination of and retaliation against Mr. Glass, Mr. Glass sustained damages, for

which Defendant is liable to Plaintiffs, as follows:

   a. Wrongful Death;

   b. Loss of Consortium;

   c. Loss of Support;

   d. Compensatory damages;

   e. Mental anguish and emotional distress;

   f. Back pay;

   g. Lost Wages;

   h. Loss of Employability;

   i. Loss of Future Earning Capacity;

   j. Benefits;

   k. Reasonable attorneys' fees;

   l. Court costs;

   m. Tripled Damages; and,

   n. Any other civil and criminal remedies under any other state, federal, or local law
      that this Court deems just and equitable.

## PRAYER FOR RELIEF

126.    **WHEREFORE**, Plaintiffs pray for judgment herein against Defendants, for

damages listed herein, to be proven at trial and as are reasonable in the premises.

## JURY DEMAND

127.    Plaintiffs are entitled to and request a trial by jury on all counts alleged herein.

Dated:  August 10, 2016

All of which is respectfully submitted,

_/s/ Hugh P. Lambert_
HUGH P. LAMBERT, T.A. (LA Bar #7933)
CAYCE C. PETERSON, ESQ. (LA Bar #32217)
JACKI L. SMITH, ESQ. (LA Bar #34769)
The Lambert Firm, PLC
701 Magazine Street
New Orleans, Louisiana 70130
T: (504) 581-1750; F: (504) 529-2931
hlambert@thelambertfirm.com
cpeterson@thelambertfirm.com
jsmith@thelambertfirm.com
*Counsel for Plaintiffs*